UNITED STATES *v.* VICTORIA GIN CO., INC., W. H. MORTON (No. 5021)[1]

---
[1] C.A.D. 759.

34 

United States Court of Customs and Patent Appeals, Nov. 17, 1960

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Murray Sklaroff*, trial attorney, of counsel) for the United States.

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *Joseph F. Donohue*, of counsel) for appellees.

[Oral argument October 11, 1960, by Mr. Sklaroff and Mr. Blauvelt]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

KIRKPATRICK, Judge, delivered the opinion of the court:

 The sole question presented by this appeal is whether the imported merchandise, which consists of mineral material containing approximately 85% of barium sulphate, was "barytes ore, crude" within the meaning of paragraph 67 of the Tariff Act of 1930. The collector classified it as such, but the Customs Court held the classification to be erroneous and sustained the importer's claim for free entry under paragraph 1719 providing for "Minerals, crude, or not advanced * * * by * * * process of manufacture, not specially provided for." (C.D. 2121)

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

█ It is well established that the collector's classification is presumptively correct. The burden of proof to show that it is wrong is upon the importer, and, in a case like the present one, involving mined material containing 85.% of a useful mineral, it would seem that the burden resting upon a party who undertakes to prove that the import is not an ore of that mineral and that it would not commonly be so described is a heavy one.

█ The general rule is that Congress is regarded as having used the name of an article in the commercial sense and that, in the absence of evidence to the contrary, the language has the same meaning in commerce that it has in ordinary use,[3] which use, of course, is to be determined as of the date of the statute.

█ We agree with the Customs Court that the interpretation of words of common speech is within the judicial knowledge and matter of law. The court may take testimony upon the point and use such of it as it deems credible as advisory, just as it may have resort to and use dictionaries, textbooks, scientific treatises and governmental publications, as an aid in arriving at its conclusion. The Customs Court had all these aids before it, as have we.

Although the importer disclaimed that it was relying upon the rule of commercial designation, its testimony was directed to showing that the term "crude barytes ore" as used in commerce excluded mineral material having less than 90% of barium sulphate, a metallic substance known also (in its natural state) as barytes and barite, arguing from that that this establishes the meaning of the term in common usage. This backdoor approach avoided the rather high degree of proof required by law to establish commercial designation, but, even so, we think that the evidence falls short even of showing that there was any such general understanding in commerce. At most, it proves that, in 1930, most manufacturers of lithopone, who at that time were the principal users of barytes ore in industry, would not buy and could not profitably use material having less than 93% or 94% of barium sulphate.

The critical finding of the Customs Court was, "What the trade and commerce of the United States knew and dealt in as crude barytes ore was material having a barium sulphate content of 90 per centum or more." It may be that what the trade *dealt in* was material having a barium sulphate content of 90% or more (although, in order to so find, the testimony of Hooey, discussed infra, would have to be disregarded), but that is a long way from establishing the fact that that was the only material which was *known* to commerce as barytes ore. From the fact that the purchasers of imported ores invariably took care to specify a desired content, it appears that the trade was very definitely aware that lower grades were within the meaning of the

---

[3] *Swan* v. *Arthur,* 103 U.S. 597.

term "crude barytes ore," could be so described, and might properly be tendered as such unless a minimum content of 90% $BaSO_4$ was specified.

At this point a brief review of the evidence may be in order. The importer called three witnesses, all of them fully qualified to testify upon the matters for which they were called. One of these (French), after some prodding, assented to the proposition that "in order to be considered barytes ore, a substance had to have 94 per cent at least, or more, of barium sulfate." However, if his testimony be read as a whole, it will be seen that it, like that of the other two witnesses, means merely that purchasers of "crude barytes ore" demanded a percentage of barium sulphate above 90%, which they assured themselves of getting by writing into their contracts of purchase an express requirement for such percentage. Thus, one witness (Winter), an importer, testified, "Q. Now, in connection with the sale of your merchandise, did you have occasion to know and to represent its barium sulfate content? A. We had to. Q. Was that an important condition of the sale? A. It was always a condition of the sale." Another importer (Teisch) testified, "Q. In offering this material for sale, was there any specification with respect to its barium sulfate content? A. As memory serves me, all of our contracts stipulated a minimum of 94 per cent $BaSO_4$ content."

All this is simply saying that barytes ore containing less than, say 93% of barium sulphate, was not a commercially acceptable grade. That "ore" was what it was actually called appears again and again in the testimony of the witnesses who seemed to have difficulty in avoiding the use of the term. Thus, as one example, Mr. French testified, "I think there was some ore produced in North Carolina and offered, but never seriously considered because it was too low grade," and, further, that the North Carolina product had a percentage of barium sulphate "around 85% because I think the product is still on the market as ground barytes."

The foregoing evaluation of the importer's testimony is borne out by the testimony of the single witness, Hooey, called by the Government. Speaking as a manufacturer of lithopone, of which, in 1929, he produced about one-fourth of all produced in the country, he testified that in 1929 he purchased several carloads of crude barytes ore in Missouri that ran 89%, that his company used as low as 85% (several hundred tons of the North Carolina ore) and, further, that during that period, although 92% barium sulphate was specified in the purchase orders, a variance was allowed "up and down," that is, the buyer paid a premium on anything over 92 and the seller took a penalty for anything under 92.

In this connection it will be noted that most of the textbook and other references quoted by the Customs Court as defining crude barytes as containing more than 90% of barium sulphate make it clear that what they are talking about is the "commercial grades" of the crude ore. This certainly means that these authorities recognize that there are other grades of the ore and, in fact, the United States Department of Commerce Information Circular of January 1930 states that "Commercial crude barite should carry more than 93 percent barium sulphate * * *. Ore running less than 90 percent barium sulphate is not commonly acceptable to the lithopone and barium chemical manufacturers * * *." As a matter of fact, none of the definitions relied on by the Customs Court exclude the lower percentages from the meaning of "crude barytes ore."

We also agree with the Customs Court that the meaning of words used in tariff acts is fixed at the time of the enactment and does not fluctuate as the meaning of words might subsequently vary,[4] but the Government made no point of the fact that a new use has been found for lower grade material so that it is now generally acceptable in commerce, nor do we.

It should be observed that it does not appear that the extraction of barium sulphate from a low grade ore is, or was in 1930, impossible. As one of the importer's witnesses testified, it was largely a matter of economics. We think, however, that the Customs Court over-emphasized the factor of profitable use for the material. True, both the Webster International and the Oxford dictionaries make it a part of their definitions of an ore that the mineral can be profitably mined and extracted. That, of course, is proper for the court's consideration, but we do not think that Congress intended to tie the meaning of the term which it adopted inseparably to the market conditions of 1930. We may assume that Congress knew that the laws of supply and demand are sometimes rudely disturbed by wars or other economic upheavals and that sudden and drastic changes in the marketability of many products follow, often resulting in a demand for things theretofore considered of little value. Congress could have easily specified the barium sulphate content requisite for the imposition of a duty if it had wished to tax only the product dealt in, but it chose to use a general term which included more than that. However, it is unnecessary to discuss that phase of the court's opinion because we are of the opinion that the evidence is insufficient to establish that the common meaning was limited as the importer contended.

The decision of the Customs Court is *reversed*.

---

[4] *Davies Turner & Co.* v. *United States,* 45 CCPA 39, C.A.D. 669.